UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

                    Plaintiff,

-against-

ROBERT PANTON,

                    Defendant.

---

No. 89 Cr. 346 (LAP)

MEMORANDUM & ORDER

LORETTA A. PRESKA, Senior United States District Judge:

   Before the Court is Defendant Robert Panton's motion (dkt. no. 910) pursuant to 18 U.S.C. § 3582 (c)(1)(A) for resentencing pursuant to the First Step Act ("FSA").  The Government opposed the motion (dkt. no. 913), and Mr. Panton submitted additional letters detailing various supplemental authorities (dkt. nos. 912, 918).  For the reasons set out below, the motion is GRANTED.

   I.   FACTUAL BACKGROUND

        a. Mr. Panton's Offense Conduct

   According to Mr. Panton's PSR, "[f]rom approximately April 1987 through May 1989, one organization was the primary source of heroin in the Bronx" – a "highly structured business organization" controlled by an individual named George Rivera "with members performing different functions and operating at different levels of responsibility, and with some members performing different functions at different times." (PSR ¶¶ 71, 73.) In April and May 1989, the Government arrested and charged thirty-three individuals

for their roles in Mr. Rivera's heroin distribution organization. (PSR ¶ 72; see also dkt. no. 910-2.)[1]

Mr. Panton was not one of those thirty-three individuals. Rather, he was arrested (and detained) on January 11, 1991, at which time he was charged and subsequently convicted at trial before the Honorable Shirley Wohl Kram of conspiracy to possess and distribute heroin in violation of 21 U.S.C. § 812, 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 841(b)(1)(A). (PSR ¶ 32, 111.) In particular, Mr. Panton, from approximately April 1988 to April 1989, ran a street-level distribution location (known as a "store" to members of Mr. Rivera's organization) at 122nd Street and 2nd Avenue in Manhattan. (PSR ¶¶ 88 115.) Because of the date that he joined Mr. Rivera's heroin distribution conspiracy, Mr. Panton was held responsible at sentencing for conspiring to possess and distribute approximately 41 kilograms of heroin, even though Mr. Rivera's organization sold a total of approximately 82 kilograms of heroin. (PSR ¶ 115.)

> b. The Probation Department's Calculation of Mr. Panton's Guidelines Offense Level

Section 2D1.1 of the Guidelines instructs that the base offense level for any narcotics-related offense is determined by

---

[1] The Government later dismissed the charges against two such individuals. (PSR ¶ 72.)

the total weight of narcotics distributed by a defendant (and those with whom s/he conspired) as detailed in the quantity tables of that section of the Guidelines. Based on its finding that he was responsible for trafficking in approximately 41 kilograms of heroin, the Probation Department determined that Mr. Panton's base offense level was 38.  (PSR ¶ 115.)[2]  It then increased that base offense level by:

- 2 offense levels pursuant to Section 2D1.1(b)(1) of the Guidelines for possession of a firearm (which was recovered from the apartment in which Mr. Panton was staying);

- 3 offense levels pursuant to Section 3B1.1(b) of the Guidelines for Mr. Panton's role as a "manager" of the "store" located at 122nd Street and 2nd Avenue in Manhattan; and

- 2 offense levels pursuant to Section 2C1.1 of the Guidelines for obstruction of justice (for perjuring himself during his trial testimony). (PSR ¶¶ 116, 117 and 119.)

Thus, in total, the Probation Department determined that Mr. Panton's adjusted Guidelines offense level was 45. (PSR ¶ 122.)

Based on certain fairly minor prior convictions in Manhattan Criminal Court (trespassing for entering the subway through an exit gate to avoid paying the fare and attempted criminal possession of a controlled substance, both of which were low-level

---

[2] Pursuant to Amendments 505 and 536 to the Guidelines, Mr. Panton's base offense level would be 36 today. But, because of the other Guidelines enhancements found by the Probation Department and Judge Kram, Mr. Panton's total adjusted Guidelines offense level still would not fall below 43 even after application of Amendments 505 and 536.

state misdemeanors and neither of which resulted in a prison term
or even a probationary sentence), the Probation Department found
that Mr. Panton had 1 criminal history point and therefore fell
within Criminal History Category I. (PSR ¶¶ 124-28.)

Thus, based on a Guidelines offense level of 45 and Criminal
History Category I, the Probation Department determined that Mr.
Panton's Guidelines range of imprisonment was life. (PSR ¶ 131.)
Notably, though, the Probation Department stated that it did not
believe Mr. Panton should be imprisoned for life. Rather, it wrote
that "[a]lthough the defendant must be punished for his crimes, a
term of life imprisonment is considered unduly harsh. Absent any
departure issues, it is being recommended in conformance with the
guidelines." (PSR ¶ 29.)

     c. Mr. Panton's Sentencing Hearing

Mr. Panton appeared before Judge Kram for sentencing on May
25, 1994. (See dkt. no. 910-3.) His attorney, Martin Geduldig (who
represented him at sentencing but not at trial) presented argument
principally concerning the Guidelines enhancements that the
Probation Department included in Mr. Panton's offense level
calculation, which arguments were based on the testimony presented
at trial and the law concerning jointly undertaken criminal
activity (as applied to the amount of heroin for which Mr. Panton
was to be held accountable at sentencing). Judge Kram, in
adjudicating Mr. Panton's post-trial, pre-sentencing motion

pursuant to Rule 33 of the Federal Rules of Criminal Procedure, also found that those enhancements applied to the calculation of Mr. Panton's Guidelines offense level. United States v. Panton, Case No. 89-CR- 346, 1994 WL 225441 (S.D.N.Y. May 25, 1994). At the conclusion of his argument concerning Mr. Panton's Guidelines offense level calculation, Mr. Geduldig expressed his frustration with the Guidelines as follows:

> [T]he sentence for somebody at Level 43 is life in prison. I don't know that there's too much that I could ask the Court to do. If the Court is going to find that's the sentence to be imposed, then whether Mr. Panton has led an exemplary life or has many children out on the street has no import. The Court is compelled to impose the sentence set forth on the [sentencing table]. I don't know what I could say, unless the Court is willing to adopt our argument and not include some these enhancements. The sentence Mr. Panton will receive from the Court is clear.

Mr. Panton also spoke at sentencing, imploring Judge Kram to impose a prison term shorter than life imprisonment. He noted that his conduct did not involve violence, that he was a father and that he was a college student at the time of his arrest. Mr. Panton also stated the following: "Facing a life imprisonment sentence as a first offender with no prior criminal activity other than a misdemeanor . . . there's not much that I can say. I mean, I could [talk] from here to now, but the situation still remains itself . . . ." Judge Kram then imposed the life sentence:

> I certainly know that you're aware that this trial went on for several months and I am very familiar with all of the

5

defendants and all of the circumstances. This was a very
dangerous group of people, very violent, and extremely
dangerous to our community.

The amount of drugs that were involved were horrendous. I
think that your part in this was a very serious one. You were
very much involved in all these aspects of it. I think you're
a dangerous man. I think that you perjured yourself blatantly
during the trial. I sat there during the trial and was
impressed with the way you blatantly lied.

I think under the circumstances, I am going to sentence you
to life imprisonment, the period that is recommended of five
years of supervised release with no particular conditions
indicated. There is no fine and the special assessment of
$50.[3]

   d. Mr. Panton's Post-Conviction Litigation

   Mr. Panton timely appealed his conviction, and, on January

19, 1996, the Court of Appeals affirmed his conviction. United

States v. Lemon, 100 F.3d 942 (2d Cir. 1996). Mr. Panton thereafter

filed an unsuccessful petition for a writ of certiorari before the

U.S. Supreme Court. Panton v. United States, 519 U.S. 853 (1996).

   Following denial of his direct appeal, Mr. Panton engaged in

certain limited additional post-conviction litigation:

   First, Mr. Panton filed a motion pursuant to 28 U.S.C. § 2255

to vacate, set aside or correct his sentence, arguing that he had

received ineffective assistance of counsel. (Docket No. 649.) On

October 18, 1999, Judge Kram denied that 28 U.S.C. § 2255 motion.

---

[3] (See also dkt. no. 910-4 (Judgment and Commitment Order, dated
May 25, 1994).)

<u>Panton v. United States</u>, Case No. 89-CR-346 (SWK), 1999 WL 945523
(S.D.N.Y. Oct. 18, 1999). On October 19, 2000, the Court of Appeals
reversed and remanded Judge Kram's denial of Mr. Panton's 28 U.S.C.
§ 2255 motion, instructing Judge Kram to permit Mr. Panton to amend
that motion to consider the merits of his claim under <u>Apprendi v.
New Jersey</u>, 530 U.S. 466 (2000), which had been decided while the
appeal of his 28 U.S.C. § 2255 motion was pending. (Dkt. No. 910-
5.) The Court of Appeals, though, affirmed the denial of all of
Mr. Panton's other 28 U.S.C. § 2255 claims as procedurally barred
or meritless. (<u>Id.</u>) On April 22, 2002, Judge Kram denied Mr.
Panton's amended 28 U.S.C. § 2255 motion. <u>Panton v. United States</u>,
Case No. 89-CR-346 (SWK), 2002 WL 655205 (S.D.N.Y. Apr. 22, 2002).
And, on September 3, 2003, the Court of Appeals dismissed Mr.
Panton's appeal of Judge Kram's denial of his 28 U.S.C. § 2255
motion. (Dkt. no. 749.)

Second, on August 2, 2004, Mr. Panton moved pursuant to Rules
60(b)(5) and 60(b)(6) of the Federal Rules of Civil Procedure to
vacate Judge Kram's denial of his 28 U.S.C. § 2255 motion, arguing
that he had received ineffective assistance of appellate counsel.
(Dkt. no. 763.) He later amended that motion, clarifying that he
was challenging the integrity of the underlying proceedings rather
than the underlying constitutional challenges to his conviction.
(Dkt. no. 766.) On November 16, 2005, Judge Kram denied Mr.

Panton's Rule 60(b) motion. Panton v. United States, Case No. 89-CR-346, 2005 WL 3078224 (S.D.N.Y. Nov. 16, 2005).

Third, on November 27, 2005, Mr. Panton filed a motion pursuant to Rules 52(b) and 59(e) of the Federal Rules of Civil Procedure for reconsideration of the denial of his Rule 60(b) motion. That motion, though, was only docketed on the civil docket sheet associated with his 28 U.S.C. § 2255 motion. Mr. Panton thereafter filed two "Judicial Notices" restating his previous arguments. The second such notice advised the Court that his Rule 59(e) motion had been pending for more than two years. On April 9, 2008 Judge Kram construed Mr. Panton's first two judicial notices as additional motions pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. (Dkt. no. 794.) Because it was only docketed on his civil docket, though, Mr. Panton's Rule 59(e) motion was inadvertently overlooked. When that Rule 59(e) motion came to light, Judge Kram vacated her April 9, 2008 Order for consideration of the newly discovered motion. (Dkt. no. 802.) Mr. Panton thereafter submitted a final "Judicial Notice" on June 17, 2010. (Undocketed.)

Mr. Panton's case was subsequently reassigned to this Court after Judge Kram died. On November 20, 2018, this Court entered an Order transferring Mr. Panton's motion to the Court of Appeals for consideration as an application for leave to file a second or successive 28 U.S.C. § 2255 motion. (Docket No. 882.) On May 6,

2019, the Court of Appeals entered an Order denying Mr. Panton's application, finding that he had not made a prima facie showing that the requirements of 28 U.S.C. § 2255(h) had been satisfied. (Dkt. no. 887.)

  e. FSA Requests

On September 3, 2019, Defendant filed a request for an 18 U.S.C. Section 3582(c)(1)(A) reduction in sentence with the Warden of USP Big Sandy, the facility in which he was incarcerated.  On December 17, 2019, more than thirty days later, the Warden rejected the request as incomplete.  Thereafter, on April 17, 2020, counsel submitted a renewed request.  On June 23, 2020, more than sixty days later, the Warden rejected the renewed request.

II.  APPLICABLE LAW

  a. This Court has the Authority to Reduce Mr. Panton's Sentence to Time Served Pursuant to 18 U.S.C. § 3582(c)(1)(A)

Mr. Panton moves pursuant to 18 U.S.C. § 3582(c)(1)(A).  That section provides that district courts can modify a "final term of imprisonment" if "extraordinary and compelling reasons warrant such a reduction." Three points bear noting with regard to the operation of 18 U.S.C. § 3582(c)(1)(A).

First, in passing the statute, Congress empowered district courts, not the U.S. Parole Commission, as previously, to decide in individual cases if "there is a justification for reducing a term of imprisonment." See S. Rep. No. 98-225, at 56 (1983). Put

differently, Congress envisioned 18 U.S.C. § 3582(c)(1)(A) acting as a "safety valve[ ] for [the] modification of sentences" and intended for district courts to be able to reduce sentences when justified by the various factors and reasons that the U.S. Parole Commission previously had considered in making parole determinations. Id. at 121. Lawmakers further noted that the foregoing approach would keep "the sentencing power in the judiciary where it belongs," rather than with the U.S. Parole Commission, and that 18 U.S.C. § 3582(c)(1)(A) would allow for the "later review of sentences in particularly compelling situations." Id. This legislative history demonstrates that Congress, in passing the Comprehensive Crime Control Act of 1984, intended to give district courts an equitable power to employ on an individualized basis to correct sentences when "extraordinary and compelling reasons" indicate that the sentence initially imposed on any individual defendant no longer served legislative objectives.

Second, although the power to reduce sentences provided for by 18 U.S.C. § 3582(c)(1)(A) has most often been used to reduce the prison terms of elderly and/or terminally ill defendants, nothing in the statutory language or legislative history of 18 U.S.C. § 3582(c) indicates that Congress intended to limit its application to elderly defendants or defendants with compelling medical circumstances. Rather, if a judge finds the existence of any

"extraordinary and compelling reasons" warranting a sentence reduction, those reasons could, pursuant to 18 U.S.C. § 3582(c)(1)(A), form the legal basis for the reduction "of an unusually long sentence." Id. at 55-56. Indeed, the legislative history of 18 U.S.C. § 3582(c)(1)(A) indicates that lawmakers thought that "extraordinary and compelling reasons" for a sentence reduction should not be limited to medical condition, age, and family circumstances. In particular, recognizing that parole had historically played a key role in the federal criminal justice system, legislators explained how some defendants may warrant a sentence reduction (after service of some period of incarceration) based on any number of "circumstances:"

> The [Senate Judiciary] Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, <u>cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence</u>, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

Id. at 55-56 (1983) (emphasis added).

Third, notwithstanding all of the foregoing, Congress originally conditioned the reduction of any "final term of imprisonment" pursuant to 18 U.S.C. § 3582(c)(1)(A) on the filing of a motion by the Director of the BOP requesting such a reduction. Thus, district courts--until the recently enacted FSA--were only authorized to

reduce a sentence based on "extraordinary and compelling reasons" if asked to do so by the Director of the BOP.

      b. The U.S. Sentencing Commission Has Indicated that the "Extraordinary and Compelling Reasons" Upon Which a Sentence Reduction Pursuant to 18 U.S.C. § 3582(c)(1)(A) May Be Based Are Not Limited to Medical Condition, Age and Family Circumstances

In enacting the Comprehensive Crime Control Act of 1984, Congress tasked the U.S. Sentencing Commission (the "Sentencing Commission") with responsibility for developing standards for identifying the existence of "extraordinary and compelling reasons" for a sentence reduction. See 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"). When the Sentencing Commission acted in 2007, it promulgated a policy statement advising that "extraordinary and compelling reasons" warranting a sentence reduction could include medical condition, age, family circumstances and "other reasons." See U.S.S.G. § 1B1.13, Application Note 1(A) (Amendment 698).

Thereafter, in April 2013, the Office of the Inspector General of the Department of Justice (the "OIG") issued a report finding that the Director of the BOP rarely filed 18 U.S.C. § 3582(c)(1)(A) sentence reduction motions (even for defendants who clearly met the Sentencing Commission's objective criteria for a sentence

reduction).   See U.S. Dep't of Justice Office of the Inspector General, The Federal Bureau of Prisons' Compassionate Release Program (Apr. 2013) (Exhibit 20).[4]   In response, the Sentencing Commission expanded its guidance to district courts on qualifying circumstances and encouraged the BOP to file 18 U.S.C. § 3582(c)(1)(A) motions whenever a defendant meets the criteria set forth in Section 1B1.13 of the Guidelines.   See U.S.S.G. § 1B1.13, Application Note 4; United States v. Dimasi, 220 F. Supp. 3d 173, 175 (D. Mass. 2016) (discussing the progression from the OIG report to new "encouraging" guidelines).   In doing so, the Sentencing Commission identified several categories of qualifying "extraordinary and compelling reasons," including medical condition, age, family circumstances and "[o]ther reasons, for circumstances in which the Director of the BOP determines that there is an extraordinary and compelling reason other than, or in combination with," medical condition, age and family circumstances.   U.S.S.G. § 1B1.13, Application Note 1(A) (internal quotation marks omitted).

Finally, Congress set forth only one limitation when it delegated authority to the Sentencing Commission to develop

---

[4] See https://oig.justice.gov/reports/2013/e1306.pdf.

standards for identifying "extraordinary and compelling reasons" for a sentence reduction: "Rehabilitation of the defendant <u>alone</u> shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t) (emphasis added).  On one hand, lawmakers no doubt legislated that sole limitation so that district courts would not use a defendant's rehabilitation, standing alone, as a basis for a sentence reduction, thereby creating a direct substitute for the parole system that Congress abolished when it passed the Comprehensive Crime Control Act of 1984.  On the other hand, legislators' use of the modifier "alone" evidences that they believed that rehabilitation <u>is relevant</u> to the question of whether a sentence should be reduced and that rehabilitation, when considered together with other equitable factors, could constitute "extraordinary and compelling reasons" for a sentence reduction.

In late 2018, Congress passed the FSA, which, among other things, fundamentally transformed the process by which 18 U.S.C. § 3582(c)(1)(A) sentence reduction motions are adjudicated.  In particular, instead of relying on the Director of the BOP to determine whether "extraordinary and compelling reasons" exist supportive of a sentence reduction and instead of relying on the Director of the BOP to file an 18 U.S.C. § 3582(c)(1)(A) sentence reduction motion, district courts today can resentence a defendant "upon motion of the defendant" as long as a defendant first files

14

a request for a sentence reduction motion with the warden of the facility in which s/he is being held that is rejected or the lapse of 30 days "from the receipt of such a request by the warden of the defendant's facility," whichever happens first. See 18 U.S.C. § 3582(c)(1)(A); United States v. Beck, Case No. 13-Cr-186-6, 2019 WL 2716505, at *5 (W.D.N.C. June 28, 2019) ("Among other things, [the FSA] add[s] a provision allowing courts to consider motions by defendants for compassionate release without a motion by the BOP Director so long as the defendant has asked the Director to bring such a motion the Director fails or refuses").

Thus, once a defendant files an 18 U.S.C. § 3582(c)(1)(A) sentence reduction motion after the occurrence of either of the two foregoing events, a district court may reduce that defendant's sentence to time served (or any other prison term short of the initial sentence) if it finds that: (1) "extraordinary and compelling reasons" exist for a sentence reduction after considering the 18 U.S.C. § 3553(a) factors; and (2) a reduced prison term is consistent with the applicable policy statements set forth in Section 1B1.13 of the Guidelines. See Beck, 2019 WL 2716505, at *6 ("Thus, courts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically

identified in the application notes to the old policy statement").
And courts have utilized that power.

United States v. Cantu-Rivera, Case No. 89-CR-204, 2019 WL
2578272 (S.D. Tex. June 24, 2019), is instructive with regard to
court's newfound authority to reduce sentences based on
"extraordinary and compelling reasons" (even if those reasons do
not relate to medical condition, age or family circumstances).
Initially, the court in Cantu-Rivera explained that "[t]he [FSA]
amended 18 U.S.C. § 3582(c)(1)(A) to allow district courts to
modify sentences of imprisonment upon motion by the defendant if
the defendant has fully exhausted all [BOP] administrative rights
. . . or 30 days from the receipt of such a request by the warden
of the defendant's facility, whichever is earlier." Id. at *1
(internal quotation marks omitted). It then reduced that
defendant's life sentence (for conspiracy to possess with intent
to distribute in excess of five kilograms of cocaine) to time
served (after service of more than 30 years imprisonment) based
principally on "the extraordinary degree of rehabilitation Mr.
Cantu-Rivera has accomplished during the 30 years he has been
incarcerated," including "extensive educational achievements,"
such as "completion of over 4,000 hours of teaching while in
federal prison to complete a Teaching Aide apprenticeship with the
Department of Labor," his "service as a teaching assistant in

16

several prison facilities for high-school equivalency and English-as-a-Second-Language programs," and "his service in the BOP's suicide watch program, helping to care for inmates placed in solitary confinement due to suicide attempts." Id. at *2.

Similarly, in United States v. Cantu, Case No. 05-CR-458, 2019 WL 2498923 (S.D. Tex. June 17, 2019), the court noted that "[a] court may now," pursuant to 18 U.S.C. § 3582(c)(1)(A), "modify a defendant's sentence if it finds on either the BOP's or the defendant's motion that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" Id. at *1. It then reduced that defendant's 290-month sentence (which had previously been reduced to 210 months based on Amendments 782 and 788 to the Guidelines) to time served (after service of more than 14 years imprisonment) based principally on his medical condition, even though he "ha[d] not presented evidence that his reasons are extraordinary and compelling under the three explicitly defined reasons" set forth in Application Note 1 to Section 1B1.13 of the Guidelines. Id. at *3.

And, in United States v. McGraw, Case No. 02-CR-00018, 2019 WL 2059488 (S.D. Ind. May 9, 2019), the court stated that the FSA's modification of 18 U.S.C. § 3582(c)(1)(A) "now provides an

avenue for a defendant to seek a [sentence reduction directly] from the Court" and that "courts have universally turned to U.S.S.G. § 1B1.13 to provide guidance on the 'extraordinary and compelling reasons' that may warrant a sentence reduction." Id. at *1. It then reduced that defendant's life sentence (for possession with intent to distribute methamphetamine) to time served (after service of more than 17 years imprisonment) based principally on "his serious medical conditions," even though he had a long criminal history and had occupied a "leadership" position in the Diablos motorcycle gang. Id. at 2-6.

III. DISCUSSION

Although the parties quibble about whether Mr. Panton has exhausted his administrative remedies, it is clear at least that his April 17, 2020 renewed motion and the Warden's subsequent denial of that motion is sufficient for exhaustion. Accordingly, the Court moves to the merits.

Over some three decades in high and medium security facilities, Mr. Panton has 1) maintained a good disciplinary record, 2) taken advantage of numerous courses and other opportunities to enable a law-abiding life, 2) evidenced a desire to help the outside community during which he demonstrated incredible empathy and compassion in an encounter with a child sex abuse victim, 4) maintained an exceptional degree of contact with his children,

and, 5) unfortunately, developed several serious health issues.  Because all of Mr. Panton's co-conspirators, except George Rivera, the leader of the drug organization, have been released or have release dates, releasing Mr. Panton would avoid a sentencing disparity.  Mr. Panton also has a viable post-release plan.  The combination of these factors constitutes "extraordinary and compelling circumstances" warranting release.

Mr. Panton has only six disciplinary infractions over almost thirty years in jail.  None involves violence, weapons, gangs, narcotics, alcohol, or BOP staff.  (One technically involved alcohol, but not on Mr. Panton's part.  Apparently, he intervened in a dispute between two other inmates, one of whom was intoxicated, over the television channel they were watching.).  This is a stellar record.

As set forth in more detail in the moving papers (dkt. no. 910), while incarcerated in USP Atlanta in 1994, Mr. Panton evidenced his concern for the outside community by participating in that facility's "Slow Down Program."  That was a program in which Atlanta's family court sent juveniles with behavioral issues to meet with inmates for the purposes of getting a glimpse of one potential future and to hear from inmates who wished they had taken a different path in life.  Although not reflected in an official BOP record, Mr. Panton states that, in counseling a young girl of approximately fifteen years old, he recognized signs of sexual

abuse—an observation he was able to make because of his experience with his own child, whose mother abused their child.  During the course of that session, the girl revealed to Mr. Panton that her father had been sexually abusing her, and he convinced her that that was wrong and that she should report it to the authorities.  When she agreed, Mr. Panton called over a female family court officer and explained what he had learned.  The girl left with the court officer, never to return, presumably because she had been removed from that home and placed in foster care.  Mr. Panton's concern that young people not follow his path and particularly his actions in rescuing the abused child are worthy of commendation.

Despite having no realistic hope of release, Mr. Panton used his time well in completing numerous courses during his incarceration.  Some, like the 500 hours of study in the Comprehensive Drug Unit, were aimed at enabling a law-abiding life.  While at USP Canaan, Mr. Panton completed the Challenge Program, another 500-hour program, to examine lifestyle and the factors that led to substance abuse and criminal behavior.  Included among other courses encouraging a law-abiding life that he completed were "History Highlights, a self-study course, and Emotional Intelligence.

Among the courses Mr. Panton took to facilitate post-release employment were Microsoft Office, Business Start-Up, and Industry

Safety Training.  Particularly notable are his completion of the Professional Paralegal Program and the Professional Paralegal Specialty Program; Civil Litigation, from the Professional Career Development Institute, in both of which courses he mostly earned grades of A/A+.  Consistent with his studies of the arts and theater management at Kingsborough Community College before his arrest, Mr. Panton also began writing during his incarceration.  His success at that endeavor is demonstrated by his selection as a finalist by the Organization of Black Screenwriters, Inc. for a screenplay that he wrote entitled "Can You Cross Over?"  Clearly, Mr. Panton has taken advantage while incarcerated of every opportunity to improve himself and to prepare for a law-abiding, productive life.

Mr. Panton has three children: Aaron Jenkins who lives in North Carolina and works in construction, Shamecca Panton who lives in Decatur, Georgia, and works as a dietary aide, and Dajoun Panton who lives in New York and works as a police officer in the NYPD.  Dajoun wrote that, although his father has been incarcerated for much of the younger Mr. Panton's life, his father was "essential in molding me into the man I am today," having "counsel[ed]" him "on many things," including his "decision on becoming a New York City Police Officer, which [his father] fully supported." (Dkt. no. 910-10.)  Similarly, Mr. Panton's daughter, Shamecca, wrote that he went to prison when she was only two years

21

old and that, even now that she is 30, "I feel that I still need my father in my life." (Dkt. no. 910-11.)  Maintaining this degree of contact with his children over some thirty years betokens a strong family support system that bodes well for Mr. Panton's living a law-abiding life.

Unfortunately, Mr. Panton's health situation has not improved over time.  He was hospitalized with Legionnaire's Disease, a type of pneumonia, in 1990, before his arrest.   As his sister Grace Carrington, a healthcare worker, relates, Mr. Panton was admitted to Lenox Hill Hospital with the disease.  While there, "the surgeon placed a central line in him that saved his life." (Dkt. no. 910-14).  (Apparently, a central line is a catheter inserted in a large vein to administer medication to critically ill patients.)  While incarcerated, Mr. Panton suffered from pneumonia in 2011 and required hospitalization at a non-BOP hospital. (See dkt. no. 910-15, Mr. Panton's medical records).  Mr. Panton has also been exposed to tuberculosis and suffers from high blood pressure (that is controlled through medication).  All of this medical history makes him more susceptible to COVID-19.  (Dkt. no. 910 at 29.)

The Court also notes that except for George Rivera, who ran the narcotics distribution organization in which Mr. Panton participated and who was also sentenced to life in prison, all of the others charged and convicted for their roles in Mr. Rivera's organization have either been released from prison or have

scheduled release dates.  (See dkt. no. 910 at 36-38.)  Among them
is David Cook, released June 28, 2016, whom the prosecutor on the
case, Henry J. DePippo, viewed as "much more culpable" than Mr.
Panton.  (Letter of Henry J. DePippo dated August 7, 2019, dkt.
no.  910-1.)   Releasing  Mr.  Panton  would  avoid  sentencing
disparity.

Mr.  Panton  undoubtedly  committed  a  serious  crime  that  wreaked
havoc  and  immeasurable  suffering  on  his  community.   As  noted,  he
was found responsible for distributing 41 kilos of heroin.  At the
same  time,  though,  Mr.  Panton  has  served  a  serious  sentence  of
almost thirty years, more than enough to deter someone considering
similar activity.

There  can  be  no  doubt  that  Mr.  Panton  has  fully  rehabilitated
himself, and there is no need for further incarceration to protect
the  public  from  additional  crimes  by  Mr.  Panton.   As  noted  above,
the  numerous  courses  he  has  completed  while  incarcerated  have
solidified  his  commitment  to  a  law-abiding  life  and  prepared  him
to  be  a  productive—and  employed—member  of  society.   His  stellar
disciplinary record is also a demonstration of his ability to live
a law-abiding life. Of course, the Court is cognizant that it may
not  grant  relief  under  the  FSA  only  for  rehabilitation,  but  Mr.
Panton presents several other reasons to grant relief.

As  noted  above,  Mr.  Panton  demonstrated  his  concern  for  the
outside   community,   particularly   at-risk   juveniles,   by

participating in the Slow Down Program in Atlanta and counseling troubled youth not to follow the path he took. His actions in persuading a sexually abused teenager to report the crime and seek help was an extreme example of compassion and demonstrated a desire to do good by exercising a degree of initiative quite unusual in an incarcerated person. It was an extraordinary act.

As noted above, Mr. Panton has also stayed in touch with his family to an extraordinary extent. Indeed, his son, who hardly knew Mr. Panton before his incarceration, describes how his father influenced him to be the man he is today, serving with the NYPD. Mr. Panton's sisters also attest to his goodness, and two of them have invited him to live with them. After an absence of almost thirty years, this is also shows extraordinary family support.

As noted above, Mr. Panton's prior bouts with Legionnaire's Disease in 1990 and pneumonia in 2011, both of which were serious and required hospitalization over numerous days, together with his high blood pressure, make him particularly susceptible to COVID-19. This circumstance also compels release.

Finally, Mr. Panton has a viable release plan with exceptional family support. He has three sisters, Greta Clarke, a retired Nurse Practitioner, Grace Carrington, a delegate for the State of Florida, and Kandel Cornwall, who holds an accounting position with a nursing home. All three live in Florida. Ms. Cornwall

wrote about their family: "Robert is loving, kind and smart. Unfortunately he made some terrible choices along the way that lead him in this situation. . . . We are a supportive family and we will support him emotionally, financially along with a loving home and environment here in Florida." (Dkt. no. 910-12.) Darcel Anderson, mother of Mr. Panton's son, Dajoun, writes that "We would love to see Robert come home to be with his family." (Dkt. no. 910-13.) Along with the support of his children noted above, this high level of family support will assist Mr. Pantone in living a law-abiding life.

If released, Mr. Panton will live with his sister, Kandel Cornwall, in her single-family home. (Dkt. no. 910-12.) Mr. Panton's other sister, Grace Carrington, has also offered Mr. Panton a place in her home. (Dkt. no. 910-14.) Both sisters are healthcare workers and can attend to his needs.

Taking all these factors into account, the Court finds that Mr. Panton has demonstrated "exceptional and compelling circumstances" warranting release.

IV.   <u>CONCLUSION</u>

For the reasons discussed above, Defendant Robert Panton's motion for resentencing pursuant to 18 U.S.C. § 3582 (c)(1)(A) (dkt. no. 910) is <u>GRANTED</u>.  He is resentenced to time served plus one week.

**SO ORDERED.**

Dated:     New York, New York
           August 4, 2020

_____
LORETTA A. PRESKA
Senior United States District Judge